******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Bright, C. J., and Alvord and Clark, Js.

*Syllabus*

The respondent parents filed separate appeals with this court from the
judgment of the trial court terminating their parental rights with respect
to their minor child, R, who had been in foster care since his discharge
from a hospital after his birth. The Department of Children and Families
became involved with the respondents when the respondent mother
threatened to harm their daughter, L. The mother had a previous history
with the department in connection with incidents involving her older
children. After L had been adjudicated neglected and committed to the
custody of the petitioner, the Commissioner of Children and Families,
the respondents' second child, R, was born, and the petitioner filed a
motion for an order of temporary custody and a neglect petition on the
basis of predictive neglect. That same day, the court granted the order
of temporary custody and ordered specific steps with which the respon-
dents were required to comply. R thereafter was adjudicated neglected
and committed to the custody of the petitioner. The trial court found
that the department had made reasonable efforts to reunify R with the
respondents but that the respondents were unwilling or unable to benefit
from the services the department offered. The court found that the
mother had resisted the department's efforts to address the key issues
underlying her history of threats or acts of violence against R and her
other children and that the father had demonstrated an inability to
accurately evaluate the risk she posed to R. The court thus concluded,
inter alia, that, pursuant to statute (§ 17a-112 (j) (3) (B) (i)), the respon-
dents had failed to achieve such a degree of personal rehabilitation as
would encourage the belief that, within a reasonable time, they could
assume responsible positions in R's life. *Held*:

1. The respondent mother could not prevail on her claim that the trial court
   committed harmful error when it admitted into evidence under the
   residual exception to the hearsay rule certain summary reports by a
   department service provider that it relied on to terminate her parental
   rights: this court, without deciding whether the summaries constituted
   inadmissible hearsay, concluded that the admission of the summaries
   was harmless, as the information in them was cumulative of that con-
   tained in the department's social study and the report of a court-
   appointed psychologist, both of which had been admitted into evidence
   without objection; moreover, despite the mother's claim that the court
   relied on the summaries to bolster and credit the conclusions in the
   psychologist's report, the court was entitled to rely on the report to
   support its findings, as it was within the court's sole province to assess
   the reliability and trustworthiness of the psychologist's conclusions and
   the weight to accord to his report; furthermore, even if the court had
   sustained the mother's objection to the summaries, she could not demon-
   strate that the outcome of the trial would have been different, as the
   record was replete with references to the challenged information, and
   she failed to articulate any manner in which the information in the
   summaries was materially different from that contained in the depart-
   ment's social study and the psychologist's report.

2. The respondent father could not prevail on his claims that the trial court
   made erroneous evidentiary findings in terminating his parental rights
   as to R:

   a. The trial court reasonably determined that the cumulative effect of
   the evidence was sufficient to justify its conclusion that the respondent
   father was unable or unwilling to benefit from the department's efforts
   to reunify him with R: the court did not rely on outdated information
   in making its determination, as the father claimed, but limited its analysis
   to events that preceded the filing of the termination petition, as required
   by the applicable rule of practice (§ 35a-7 (a)); moreover, the record
   adequately supported the court's conclusion that, in the event of reunifi-

cation, the respondent mother would be R's primary caregiver when the father was at work, as the respondents were unified in their intentions to parent R as a couple; furthermore, the record reflected that the father, who declined to pursue reunification on his own, was defensive about and overprotective of the mother and appeared to minimize the threat of harm she posed to R, as the mother resisted efforts to address the issues that led to R's removal from her care, rebuffed recommendations for treatment to address her past trauma and refused to take accountability for the events at issue.

b. The evidence was sufficient to support the trial court's conclusion that the respondent father had failed to achieve the requisite degree of personal rehabilitation so as to encourage the belief that, within a reasonable time, he could assume a responsible position in R's life: contrary to the father's claim, the court's consideration of evidence that predated the filing of the petition to terminate his parental rights was proper under § 35a-7 (a), the father failed to point to any specific postpetition evidence the court declined to consider that was probative of his rehabilitation, and the postpetition evidence that the respondents did introduce did not offer any additional perspective that was determinative of the issue of the father's rehabilitation; moreover, the father's contention that, with proper support services in place, he could assume a responsible position in R's life was unavailing, as there was no indication that he sought the department's help in obtaining additional support services or that he intended to rely on support services if reunification were to be granted, even though he was apprised of the department's concerns with respect to the respondents' intention to have the respondent mother care for R when he was at work; furthermore, regardless of the father's progress toward addressing the factors that led to R's commitment, and given his failure to appreciate the risk that the mother posed to the children's safety and his commitment to parent R with her, the court, in making its determination, was entitled to rely on his continued involvement with the mother, whom the court also determined had failed to achieve sufficient rehabilitation.

c. The trial court's determination that it was in R's best interest to terminate the respondent father's parental rights was factually supported by the court's findings and conclusions with respect to the factors set forth in § 17a-112 (k): the court found that the department had timely made referrals to address the respondents' needs and reasonable efforts to reunify them with R but that, despite having made significant progress toward improving his marital relationship and complying with nearly every one of the specific steps, the father remained unable to appropriately assess the threat that the mother posed to R; moreover, although the court weighed the evidence that was more favorable to the father, it found that R had bonded with his foster family, with whom he had spent his entire life, and noted that R could not afford to wait for the respondents to make the necessary adjustments to ensure his safety and well-being.

Argued May 18—officially released September 1, 2022**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Windham, Juvenile Matters at Willimantic, and tried to the court, *Chaplin, J.*; judgments granting the petitions, from which the respondents filed separate appeals with this court; thereafter, the respondents withdrew their appeals in part. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant in Docket No. AC 45124 (respondent mother).

*David B. Rozwaski*, assigned counsel, for the appellant in Docket No. AC 45156 (respondent father).

*Michael J. Besso*, assistant attorney general, with

whom, on the brief, were *William Tong*, attorney general, *Claire Kindall*, solicitor general, and *Evan O'Roark*, *Jennifer C. Leavitt* and *Nisa Kahn*, assistant attorneys general, for the appellee (petitioner in both appeals).

*Kelly L. Babbitt*, for the minor child in both appeals.

*Opinion*

CLARK, J. In these two appeals, the respondent mother, Chrystal P., and the respondent father, William D., appeal from the judgment of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating their parental rights as to their minor child, Richard D.[1] In Docket No. AC 45124, the respondent mother claims that the trial court improperly admitted into evidence two documents under the residual exception to the rule against hearsay. In Docket No. AC 45156, the respondent father claims that the court improperly concluded that (1) the Department of Children and Families (department) had made reasonable efforts to reunify him with Richard or, alternatively, that he was unwilling and unable to benefit from those reunification efforts, (2) he had failed to achieve the requisite degree of rehabilitation required by General Statutes § 17a-112 (j), and (3) it would be in Richard's best interest to terminate his parental rights. We affirm the judgment of the trial court.[2]

The following facts and procedural history are relevant to both appeals. The department became involved with the respondents in June, 2017, when the respondent mother threatened to harm the respondents' daughter, Lillyanne D., who, at that time, was less than one year old.[3] In July, 2017, the department received another referral after the respondent father called 911 to report that the respondent mother had threatened to harm Lillyanne[4] and had held Lillyanne tightly across her chest, causing her to cry, during an argument between the respondents. In both instances, the respondent mother had threatened harm to Lillyanne as retribution against the respondent father. As a result of the July, 2017 incident, criminal charges were filed against the respondent mother, and the criminal court issued a full protective order, which prohibited her from having any contact with the respondent father and Lillyanne.[5] Lillyanne remained in the care of the respondent father, who signed a safety plan with the department in which he agreed to abide by the protective order and to prohibit the respondent mother from having any unsupervised visits with Lillyanne in the event that the protective order was modified.

During its investigation, the department learned that the respondent mother had a history with the department dating to 1997, when her eldest child, Margaret T., was removed from her care following a domestic dispute with Margaret's father, James T. During that incident, the respondent mother reportedly had attacked James with a pen and picked up Margaret, who was five weeks old, by one arm and dangled her in the air twice, stating: "Look what I can do."[6] The department's files also indicated that the respondent mother had subsequently been involved with Michael T., with whom she had two children. In 2015, the depart-

ment had received a referral alleging that the respondent mother and Michael had been arrested after getting into a domestic dispute that was witnessed by their children.[7] When interviewed during the department's investigation into the allegations concerning Lillyanne, Michael indicated that the respondent mother had a history of attempting or threatening to harm one of their children when they were in a relationship.[8]

On October 2, 2017, the criminal protective order was vacated, and the respondent mother moved back into the respondents' home shortly thereafter. On October 5, 2017, the department learned that the respondent mother was residing in the home and attempted to create a safety plan with the respondents. The respondents declined to implement a safety plan and were informed by the department that the respondent mother's presence in the home placed Lillyanne at risk of removal from their care. The next day, the petitioner filed a motion for an order of temporary custody and a neglect petition on behalf of Lillyanne. The court granted the ex parte order of temporary custody and ordered specific steps for the respondents to take to facilitate their reunification with Lillyanne. The order of temporary custody was sustained by agreement of the parties on October 10, 2017. Lillyanne was adjudicated neglected and committed to the care and custody of the petitioner on July 9, 2018.

In June, 2019, the respondents' second child together, Richard, was born. On June 7, 2019, the petitioner filed a motion for an order of temporary custody and a neglect petition as to Richard on the basis of predictive neglect. That same day, the court granted the order of temporary custody, ordered specific steps with which the respondents were required to comply, and scheduled a contested hearing. Richard was adjudicated neglected and committed to the care and custody of the petitioner on June 21, 2019. On October 8, 2019, the petitioner filed termination of parental rights petitions as to both Lillyanne and Richard, which alleged that the respondents had failed to rehabilitate pursuant to § 17a-112 (j).[9] The termination of parental rights trial was held on July 12, 13, 15 and 16, 2021.

In a memorandum of decision dated September 17, 2021, the court granted the termination petitions. In the adjudicatory phase of the proceedings, it initially found, by clear and convincing evidence, that the children had been adjudicated neglected in prior proceedings, that the department had made reasonable efforts to locate and reunify the children with the respondents, and that the respondents remained unwilling or unable to benefit from the services the department offered. The court further found that the respondents had failed to achieve an appropriate degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the children,

they could assume responsible positions in the children's lives. The court's conclusion that the respondents had failed to rehabilitate was predicated on its finding that the respondent mother had resisted efforts to address the key issues underlying her history of threats or acts of violence against her children and had minimized the nature of the events that led to Lillyanne's removal from her care. With respect to the respondent father, the court found that the respondents were unified in their intentions to parent as a couple and that the respondent father had demonstrated an inability to accurately evaluate the risk the respondent mother poses to the children.

In the dispositional phase of the proceedings, the court made findings as to each of the criteria set forth in § 17a-112 (k) and concluded that the termination of the respondents' parental rights would be in the best interests of Lillyanne and Richard. Accordingly, the court appointed the petitioner as the statutory parent of the children. These appeals followed. Additional facts will be set forth as necessary.

I

AC 45124

The respondent mother claims that the court improperly admitted into evidence two documents under the residual exception to the rule against hearsay and that the admission of those documents constituted harmful error because the court could not have reached the decision to terminate her parental rights as to Richard in the absence of the information contained within those documents. Without deciding whether the challenged documents fall within any of the exceptions to the rule against hearsay, we conclude that the admission of the documents, even if improper, was harmless.[10]

The following additional facts and procedural history are relevant to the disposition of the respondent mother's claim.[11] At the termination trial, the petitioner offered testimony from two witnesses and presented ten exhibits, all of which the court admitted into evidence in full. Relevant to this appeal, the court admitted a social study and an addendum to the social study (addendum), which were authored by Jennifer L. Andrews, a department social worker assigned to the respondents' case, who testified at trial. Both the social study, dated September 10, 2019, and the addendum, dated June 24, 2021, were admitted into evidence without objection.

The social study outlines, among other things, the observations and assessments of United Services, Inc. (USI), staff members, who worked with the respondents in 2018 when they participated in two reunification programs, Therapeutic Family Time and Reunification and Therapeutic Family Time (reunification program(s)).[12] Following each reunification program that

the respondents participated in, USI staff members authored a summary report (summaries), both of which are the subjects of the respondent mother's claim on appeal.

In the social study, Andrews noted that the USI staff members had reported the following concerns with respect to the respondent mother: her inappropriate tone in regard to her interactions with Lillyanne; her poor reception of feedback and suggestions made by staff members; a continued lack of insight into the circumstances that led to Lillyanne's removal from her care; and her statements indicating that, after the department was no longer involved with the family, she would parent her children in the manner she saw fit. It was also noted that the USI staff members had concluded that the respondent mother was unwilling to implement the parenting strategies taught during the reunification programs and did not recommend reunification between the respondent mother and Lillyanne.

The petitioner also offered the testimony of and a report prepared by David M. Mantell, a clinical and forensic psychologist, who had been appointed by the court to evaluate the respondents and provide recommendations with respect to reunification. Although counsel for both respondents initially objected to the introduction of Mantell's report, those objections were later withdrawn, and the court admitted his report in full. In evaluating the respondents, Mantell reviewed the records of and spoke with other service providers who had worked with the respondents since the June, 2017 incident concerning Lillyanne that led to the initial referral to the department. In his report, Mantell thoroughly described the contents of both of the challenged summaries, often citing the observations and conclusions of the USI staff members verbatim. Additionally, he indicated that he did not recommend reunification as of the date of his report, June 1, 2019.

The petitioner did not call the USI staff members who had authored or approved the summaries as witnesses at trial but, instead, sought to admit the summaries into evidence during Andrews' direct examination. Counsel for the respondent mother objected on the ground that the summaries constituted inadmissible hearsay. The petitioner responded that the summaries fell within the business records exception to the rule against hearsay. See Conn. Code Evid. § 8-4. The court concluded that the petitioner had not established a proper foundation to satisfy the business records exception but that the summaries were nonetheless admissible under the residual exception to the hearsay rule and admitted them in full.

On appeal, the respondent mother claims that the trial court improperly admitted the summaries under the residual exception to the hearsay rule and that the court's reliance on the observations and conclusions

of the USI staff members described within the summaries to terminate her parental rights demonstrates that the court's error was prejudicial. Specifically, the respondent mother argues that the court's factual findings and conclusion that she had failed to achieve an appropriate degree of rehabilitation substantially were based on the following information contained within the summaries: the respondent mother's continued lack of insight into the circumstances that led to Lillyanne's removal from her care; her persistent remarks that she would parent her children as she deemed appropriate; her resistance to implement the parenting strategies taught during the reunification programs; the USI staff members' lack of confidence with regard to the respondent mother's ability to keep Lillyanne safe from harm; and the respondent mother's unwillingness to modify her parenting strategies. With respect to the court's conclusion that termination of her parental rights was in the children's best interests, the respondent mother argues that the court improperly relied on the summaries to find that she had failed to appreciate the gravity of her threats of violence toward her children and that, despite the efforts of the USI staff members, the respondent mother remained steadfast in her determination to raise her children " 'as she sees fit.' "

Notwithstanding the respondent mother's argument, the record discloses that all of the foregoing contested information was restated in Mantell's report *and* the department's social study—either in substance or quoted nearly word for word from the summaries—both of which were admitted into evidence as full exhibits without objection. The social study, for example, outlines the concerns of the USI staff members that the respondent mother now alleges on appeal were improperly admitted into evidence through the summaries and relied on by the court to terminate her parental rights. Mantell's report likewise comprehensively details that same information. Moreover, the court could have predicated its findings and conclusions on other evidence presented at trial. Andrews, for example, testified that Jessica Janczyk, a licensed counselor with whom the respondent mother had engaged with for counseling services, also assessed the respondent mother as lacking an understanding regarding the seriousness of the incident that led to the department's involvement and resistant to implementing recommendations made by service providers.

When challenging a court's evidentiary ruling, a party "must show that the court abused its discretion in admitting the challenged evidence and that any improper admission caused [the party] substantial prejudice or injustice." *In re Tayler F.*, 111 Conn. App. 28, 36, 958 A.2d 170 (2008), aff'd, 296 Conn. 524, 995 A.2d 611 (2010). In order to demonstrate that she was harmed, the respondent mother must establish that, but for the evidentiary error, the outcome of the trial likely

would have been different. See, e.g., *In re Alizabeth L.-T.*, 213 Conn. App. 541, 602, 278 A.3d 547 (2022). This she cannot do. Even if we were to conclude that the court improperly admitted the summaries into evidence under the residual exception to the hearsay rule, the information contained therein was available elsewhere in the record. The respondent mother fails to articulate any manner in which the information within the allegedly inadmissible summaries that the trial court relied on to terminate her parental rights was materially different from the information that was provided through the department's social study and Mantell's report. Thus, the contested information was entirely cumulative. "It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted [evidence]." (Internal quotation marks omitted.) *In re Anna B.*, 50 Conn. App. 298, 305–306, 717 A.2d 289 (1998); see also *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 23, 60 A.3d 222 (2013) ("[i]n determining whether evidence is merely cumulative, we consider the nature of the evidence and whether any other evidence was admitted that was probative of the same issue as the evidence in controversy").

Additionally, although the respondent mother acknowledges that the court relied on additional evidence, such as Mantell's report, to terminate her parental rights, she argues that the court's admission of the summaries was nevertheless harmful because the court relied on the improperly admitted hearsay evidence, i.e., the summaries, to bolster and credit Mantell's conclusions and his recommendation against reunification. This argument misses the mark. Insofar as the respondent mother is challenging the reliability and trustworthiness of Mantell's conclusions, it is well established that the weight accorded to evidence presented at trial is within the sole province of the fact finder. See *In re Leo L.*, 191 Conn. App. 134, 142, 214 A.3d 430 (2019) ("it is the trial court's role to weigh the evidence presented and determine relative credibility when it sits as a fact finder"). Because Mantell's report was admitted as a full exhibit, without objection, the court was entitled to rely on it to support its findings. See *In re Leilah W.*, 166 Conn. App. 48, 71, 141 A.3d 1000 (2016). More importantly, as we have explained, even if the court had sustained the respondent mother's objection to the summaries, the record is replete with references to the information she now challenges on appeal.

We conclude that, because the evidence contained within the summaries was merely cumulative of other validly admitted evidence contained in Mantell's report and the department's social study, and the respondent mother has failed to establish that the result of the trial would have been different had the summaries not been admitted into evidence, their admission was harmless.

## II

### AC 45156

The respondent father claims that the trial court erroneously found that (1) the department had made reasonable efforts toward reunification and that he was unwilling or unable to benefit from the department's reunification efforts,[13] (2) he had failed to achieve a degree of rehabilitation sufficient to encourage the belief that, within a reasonable time, he could assume a responsible position in Richard's life, and (3) termination of his parental rights was in Richard's best interest. We address each of these claims in turn.

Initially, we briefly set forth the relevant legal principles that govern termination of parental rights proceedings. Pursuant to § 17a-112 (j), "[t]he Superior Court, upon notice and hearing . . . may grant a petition [to terminate parental rights] . . . if it finds by clear and convincing evidence that (1) the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." (Internal quotation marks omitted.) *In re Ryder M.*, 211 Conn. App. 793, 807, 274 A.3d 218, cert. denied, 343 Conn. 931, 276 A.3d 433 (2022).

"[A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citation omitted; internal quotation marks omitted.) *In re Ja'La L.*, 201 Conn. App. 586, 595, 243 A.3d 358 (2020), cert. denied, 336 Conn. 909, 244 A.3d 148 (2021). "Because a respondent's fundamental

right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Egypt E.*, 327 Conn. 506, 527, 175 A.3d 21, cert. denied sub nom. *Morsy E.* v. *Commissioner, Dept. of Children & Families*,      U.S.     , 139 S. Ct. 88, 202 L. Ed. 2d 27 (2018).

The following additional facts provide the necessary context for our discussion of the respondent father's claims.[14] The respondent mother experienced a turbulent childhood and has a history of untreated mental health issues. As a result of the incidents precipitating Lillyanne's removal from the respondents' care, the department made referrals for individual counseling and a substance abuse evaluation to assist the respondent mother in addressing her mental health concerns. In August, 2017, the respondent mother engaged in treatment with Janczyk, who diagnosed the respondent mother with an anxiety based disorder. During the nearly two years that the respondent mother met with Janczyk, the respondent mother continued to insist that she never posed a threat to Lillyanne and refused to acknowledge the concerning nature of her actions that led to the department's involvement in this case. Additionally, the respondent mother continually rejected Janczyk's recommendation to engage in trauma focused therapy because the respondent mother believed that her childhood trauma was not impacting her and that trauma focused therapy was therefore unnecessary.

In January, 2018, the respondents began a twelve week reunification program with USI. The USI staff members reported that the respondent mother lacked insight into the reason for Lillyanne's removal from her care and was difficult to engage with during the program, resistant to implementing new parenting strategies, and unaware of developmentally appropriate expectations. It was recommended that the respondent mother continue to engage in individual therapy to address her past trauma.

In March, 2018, the respondent mother participated in a neuropsychological evaluation with Sarah E. Bullard, a clinical neuropsychologist. In a report dated June 9, 2018, Bullard opined that the respondent mother's test results indicated a deficit in executive function and impaired intellectual abilities. The respondent mother was assessed as having unreliable problem solving skills and a processing impairment, which could cause her to become overwhelmed, frustrated, and unable to manage stressful situations. Additionally, Bullard noted that the respondent mother was reluctant to admit to shortcomings and presented as detached and unemotional at times.

In June, 2018, the respondents participated in another twelve week reunification program with USI staff mem-

bers, who reported that the respondent mother remained obstinate in her resistance to implementing new parenting strategies and continued to "lack insight into the circumstances that led to [Lillyanne's] removal." Although the USI staff members felt confident about the respondent father's parenting abilities and observed that he shared a strong bond with Lillyanne, they expressed concern that his work schedule would leave the respondent mother as the primary caregiver. They additionally noted that they were not confident with respect to the respondent mother's ability to recognize and meet Lillyanne's needs or to keep Lillyanne safe, and recommended that the respondent mother continue to engage in therapy to address her past trauma.

The respondents also engaged in couples counseling with Richard Hisman, a clinical counselor, for approximately six months beginning in September, 2018, to address intimate partner violence concerns and communication issues. Hisman opined that the respondents had made significant progress in developing effective communication skills during the course of their counseling sessions.

In May, 2019, the respondents participated in a court-ordered psychological evaluation with Mantell. In addition to reviewing the USI summaries, Bullard's report, and other records related to the respondents' case, Mantell interviewed the respondents, spoke with service providers who had worked with them, conducted psychological evaluations of both respondents, and observed a parent-child visit between the respondents and Lillyanne. With respect to the respondent mother, Mantell opined that she presented as a "very weak and often unreliable personal historian who is denying her own responsibilities for the loss of custody of [Lillyanne]." He noted that she was reluctant to address and was in avoidance of "major issues of personal violence and threat[s] that have been a part of her life since childhood" and that "[t]hreatening to harm a child is a rare protection issue . . . [that] cannot be considered resolved by not talking about it and by rejecting accountability for its occurrence." Accordingly, Mantell concluded that the respondent mother needed further focused treatment to address her past "exposures to family violence, both physical and verbal, as well as her thoughts about violence and her use of violent threats with at least [two] marital partners and with at least [two] children." With respect to the respondent father, Mantell noted that the respondent father "speaks for his wife in multiple settings in ways that are considered overprotective and defensive" and that the respondent father had stated that he was not at all concerned with the respondent mother being home alone with a toddler and a newborn. Additionally, Mantell reported that he had spoken with Kimberly Applewhite, who provided individual counseling to the respondent father for about one and one-half years after Lillyanne was

placed in the custody of the petitioner. When asked about her understanding of the respondent father's views regarding the respondent mother's judgment, Applewhite informed Mantell that the respondent father appeared comfortable with the respondent mother's being alone with Lillyanne while he was at work. Mantell consequently did not recommend reunification as of the date of his report, June 1, 2019, because "[t]here are too many issues in this case involving parent-and-child violence and threat[s] of violence which remain unresolved."

In support of the termination of parental rights petitions, the petitioner filed with the court the September 10, 2019 social study authored by Andrews, which was admitted into evidence at trial.[15] Relevant to this appeal, Andrews reported that the department previously had discussed with the respondent father its concerns regarding the respondent mother and that reunification would be appropriate as to him if he pursued reunification on his own. The respondent father told the department that he would not pursue reunification without the respondent mother, however. Notwithstanding the department's repeated concerns that the respondent mother would be the primary caregiver for the children while the respondent father was at work, the respondent father did not suggest an alternative caregiving plan until the department informed him that it did not recommend reunification.[16] Andrews also noted that the respondent father continually minimized the respondent mother's statements and behaviors that led to the department's involvement in this case.

### A

We first consider the respondent father's claim that the trial court improperly found that he was unable or unwilling to benefit from reunification efforts.

"As part of a termination of parental rights proceeding, § 17a-112 (j) (1) requires the department to prove by clear and convincing evidence that it has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . . Accordingly, the department must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts."[17] (Emphasis omitted; internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 552, 979 A.2d 469 (2009).

"[I]n determining whether the department has made reasonable efforts to reunify a parent and a child or whether there is sufficient evidence that a parent is unable or unwilling to benefit from reunification efforts, the court is required in the adjudicatory phase to make its assessment on the basis of events preceding the date

on which the termination petition was filed. . . . This court has consistently held that the court, [w]hen making its reasonable efforts determination . . . is limited to considering only those facts preceding the filing of the termination petition or the most recent amendment to the petition . . . . Practice Book § 35a-7 (a) codifies this procedural rule by providing: In the adjudicatory phase, the judicial authority is limited to evidence of events preceding the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *In re Cameron W.*, 194 Conn. App. 633, 660–61, 221 A.3d 885 (2019), cert. denied, 334 Conn. 918, 222 A.3d 103 (2020).

Finally, in reviewing whether a trial court properly determined that a parent is unwilling or unable to benefit from the department's reunification efforts, "the trial court's subordinate factual findings are reviewable only for clear error, [but] the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. . . . On review, we must determine whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court." (Internal quotation marks omitted.) *In re Xavier H.*, 201 Conn. App. 81, 87, 240 A.3d 1087, cert. denied, 335 Conn. 981, 241 A.3d 705 (2020), and cert. denied, 335 Conn. 982, 241 A.3d 705 (2020).

In the present appeals, the court found that the department had made reasonable efforts to locate the respondents and to reunify them with the children. It noted that, since Lillyanne entered into the petitioner's custody in 2017, the petitioner had maintained contact with the respondents and offered each respondent appropriate services to facilitate reunification in accordance with the court-ordered specific steps,[18] which, among other things, required the respondent father to engage in parenting and individual counseling and to make progress toward ensuring Richard's safety and well-being.

Notwithstanding its finding that the department had satisfied its obligations under § 17a-112 (j) (1), the trial court also concluded that the respondent father was unable or unwilling to benefit from the department's efforts to reunify him with Richard. In so concluding,

the court observed that the respondent mother had "resisted all efforts to address the central issue of parent-child threats of violence and parent-child violence. She has repeatedly refused to engage in treatment necessary for her to make progress regarding her parent-child violence issues and, thereby, demonstrated her inability and/or unwillingness to benefit from the petitioner's efforts to reunify the respondent parents with Lillyanne and Richard. [The] respondent parents are unified in their positions in this matter and plan to parent as a unit, with [the] respondent mother serving as the primary caretaker. [The] respondent father has demonstrated a continued inability to properly evaluate the threat of harm [the] respondent mother poses to the children while her parent-child violence issues remain unaddressed and untreated and, thereby, demonstrated his inability and/or unwillingness to benefit from the petitioner's efforts to reunify the respondent parents with Lillyanne and Richard."

The respondent father raises two primary arguments in support of his claim that the trial court improperly found that he was unwilling or unable to benefit from reunification services. First, he asserts that the court's findings are premised on outdated information and failed to account for the respondents' continuing progress and engagement with services after the petitioner filed the termination of parental rights petitions. Second, he argues that the court's determination that he was unable or unwilling to benefit from the department's efforts to reunify him with Richard is predicated on its erroneous finding that the respondent mother would be the primary caregiver for the children while he is at work. We are not persuaded.

We first consider the respondent father's assertion that the court relied on outdated information to reach its conclusion that he was unwilling or unable to benefit from reunification services. In support of this claim, the respondent father argues that the court's findings were based entirely on information predating the filing of the termination petitions in October, 2019, and that the court failed to consider the observations and testimony of service providers who worked with the respondents after the filing of the petitions. The respondent father's contention that the court improperly had relied on reports and information predating the petition to terminate his parental rights, however, directly contravenes our rules of practice, which provide that trial courts are, generally, "limited to evidence of events preceding the filing of the petition or the latest amendment" during the adjudicatory phase of termination proceedings. Practice Book § 35a-7 (a); see also *In re Cameron W.*, supra, 194 Conn. App. 660. Consequently, we conclude that this argument fails.

Having concluded that the court properly limited its analysis to events preceding the filing of the termination

petitions, we next review the court's subordinate factual findings and consider whether clear and convincing evidence supports the trial court's ultimate conclusion that the respondent father was unwilling or unable to benefit from the department's reasonable efforts toward reunification.

Initially, we note that the respondent father does not challenge the court's finding that he and the respondent mother were unified in their intentions to parent the children together. Nor does the respondent father challenge the court's findings with respect to the respondent mother's resistance to addressing her history of parent-child violence and threats prior to the filing of the termination petitions. Rather, he contends that the court's conclusion that he was unwilling or unable to benefit from the department's efforts toward reunification is based on a finding that lacks evidentiary support, namely, that the respondent mother would be the primary caregiver for the children when he was at work. The court's finding that the respondent mother would serve as the primary caregiver, however, is adequately supported by the record, which indicates that the USI staff members expressed concerns that the children would be left in her care while the respondent father was at work. In the department's social study, Andrews also noted that the respondent father's work schedule would result in the respondent mother's assuming the primary caregiving role in the event that the respondents were reunified with the children.[19] Although the department repeatedly raised concerns about this plan, the respondent father did not suggest an alternative care plan until the department indicated that it would not recommend reunification. Additionally, multiple service providers had observed that the respondent father appeared comfortable with the respondent mother's remaining home alone with the children. Thus, contrary to the respondent father's claim, the court's finding that the respondent mother would be the primary caregiver for the children is not clearly erroneous.

The record establishes that, as of the date of the petition to terminate her parental rights, the respondent mother continued to resist efforts to address the key issues that had led to the children's removal from the respondents' care. The respondent mother rebuffed recommendations to engage in treatment to address her past trauma and refused to take accountability for the events that led to the department's involvement in this case. As a result, multiple service providers lacked confidence in the respondent mother's ability to recognize the children's needs or to keep them safe from harm. The record also reflects that the respondent father presented as defensive about and overprotective of the respondent mother and appeared to minimize the threat of harm she poses to the children. Additionally, although the department had expressed that reunification would be appropriate as to the respondent father

alone, he declined to pursue reunification on his own and remained steadfastly committed to coparenting the children with the respondent mother. On the basis of the foregoing, the trial court reasonably determined that the cumulative effect of the evidence was sufficient to justify its ultimate conclusion that the respondent father was unable or unwilling to benefit from the department's efforts to reunify him with Richard.

B

The respondent father also challenges the court's finding that he had failed to achieve a sufficient degree of rehabilitation pursuant to § 17a-112 (j) (3) (B) (i). For the reasons that follow, we conclude that this claim is unavailing.

"Failure of a parent to achieve sufficient personal rehabilitation is one of six statutory grounds on which a court may terminate parental rights pursuant to § 17a-112. [See General Statutes § 17a-112 (j) (3) (B) (i).] That ground exists when a parent of a child whom the court has found to be neglected fails to achieve such a degree of rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, the parent could assume a responsible position in the life of that child." (Internal quotation marks omitted.) *In re Leilah W.*, supra, 166 Conn. App. 67.

"Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. . . . Rather, [§ 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation [the parent] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life." (Internal quotation marks omitted.) *In re Lilyana P.*, 169 Conn. App. 708, 717–18, 152 A.3d 99 (2016), cert. denied, 324 Conn. 916, 153 A.3d 1290 (2017). "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but rather whether [he or she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Phoenix A.*, 202 Conn. App. 827, 845, 246 A.3d 1096, cert. denied, 336 Conn. 932, 248 A.3d 1 (2021).

With respect to a claim that a trial court improperly concluded that a parent failed to achieve sufficient rehabilitation, we review the court's subordinate factual findings for clear error. See, e.g., *In re Anaishaly C.*, 190 Conn. App. 667, 681, 213 A.3d 12 (2019). The court's determination that a parent has failed to rehabilitate, however, is subject to the evidentiary sufficiency standard of review. Id.; see also part II A of this opinion. Finally, we note that "the mere existence in the record of evidence that would support a different conclusion, without more, is not sufficient to undermine the finding of the trial court. Our focus in conducting a review for evidentiary sufficiency is not on the question of whether there exists support for a different finding—the proper inquiry is whether there is enough evidence in the record to support the finding that the trial court made." (Emphasis omitted.) *In re Jayce O.*, 323 Conn. 690, 716, 150 A.3d 640 (2016).

In determining that the respondent father had failed to rehabilitate sufficiently, the court set forth the following relevant findings in its memorandum of decision, emphasizing that the "primary issues in this matter are the threat of physical harm that the respondent mother poses to the children and the respondent father's ability to accurately assess the threat of harm that the respondent mother poses to the children." Although the court acknowledged that the respondent father had made a concerted effort to comply with many of the court-ordered specific steps to address the department's main concerns, it noted that compliance with specific steps does not necessarily demonstrate that a parent has achieved sufficient rehabilitation. See *In re Brian P.*, 195 Conn. App. 558, 569, 226 A.3d 159 ("[The] completion or noncompletion [of the specific steps] . . . does not guarantee any outcome . . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.)), cert. denied, 335 Conn. 907, 226 A.3d 151 (2020). Thus, notwithstanding the respondents' progress in certain respects, the court underscored that its main concern was not the number of steps the respondents had complied with but, rather, that the "respondent parents have failed to comply in a substantive manner with the specific steps that raise the most concern."

With respect to the respondent mother, the court found that she "has a history of untreated mental health issues" and noted that she initially became acquainted with the petitioner nearly twenty years prior to the present case. The court then summarized the observations of the various service providers who had worked with the respondent mother to assist her in rehabilitating. Specifically, the court highlighted the observations of the USI staff members, Mantell, and Janczyk concern-

ing the respondent mother's resistance to engaging in treatment to address her history of family violence, her reluctance to modify her parenting strategies, and her lack of accountability for the events that had precipitated the department's involvement in this case. For those reasons, among others, the court found that the respondent mother had demonstrated a "consistent resistance to address her pattern of parental violence toward her own children, to address the impact of her past trauma on the threat she poses to the children, and to take accountability for her attitudes, behaviors and actions that led to Lillyanne's removal from her care." The court further found that the "respondent mother's refusal to discuss her behaviors and the cause thereof is the single most important issue in this case and the foremost barrier to her deriving any rehabilitative benefit from the services provided by the petitioner." As a result of its findings, the court determined that the respondent mother had failed to rehabilitate, noting that it agreed with Mantell's assessment that "[t]here are too many issues in this case involving parent-and-child violence and threat[s] of violence which remain unresolved."

With respect to the respondent father, the court remarked that his barriers to reunification with the children, although fewer, were nonetheless "highly disconcerting." The court noted that the respondent father had been observed to be "sensible, attentive, [and] reasonable" during Mantell's evaluation, and someone who appears to understand appropriate parenting techniques and demonstrated compassion and patience for both Lillyanne and the respondent mother. The court also found that the respondent father had been described as "enmeshed" with the respondent mother and was overprotective and defensive of her, which impeded her progress in holding herself accountable for her actions and addressing the issues that underlie her behaviors. Consequently, the court found that the respondent father enabled the respondent mother and "consistently demonstrated a blind spot for appropriately assessing the risk that the respondent mother poses to the children's welfare and safety." The court also found that the parents consistently had presented as united in their intentions to parent the children together, with the respondent mother assuming the primary caregiving role should reunification be granted. On the basis of the respondent mother's unwillingness to address her unresolved mental health issues and the respondent father's unwavering commitment to coparent with the respondent mother, the court concluded that the respondent father had failed to achieve an appropriate degree of rehabilitation sufficient to encourage the belief that he could assume a responsible role in the children's lives within a reasonable time.

In challenging the court's determination that he had failed to rehabilitate, the respondent father again argues

that the court improperly relied on outdated information that preceded the filing of the termination petitions to support its findings and failed to consider evidence of rehabilitation that occurred subsequent to the filing of the petitions. This contention lacks merit. First, as noted, Practice Book § 35a-7 (a) makes clear that, "[i]n the adjudicatory phase, the judicial authority is limited to evidence of events *preceding* the filing of the petition or the latest amendment, except where the judicial authority must consider subsequent events as part of its determination as to the existence of a ground for termination of parental rights." (Emphasis added.) Thus, it was appropriate and proper for the court to consider the evidence before it that predated the filing of the petition.

With respect to postpetition evidence, our courts have held that a "court *may* rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis added.) *In re Keyashia C.*, 120 Conn. App. 452, 457 n.12, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010). In this case, however, the respondent father has failed to point to any specific postpetition evidence that was probative of his rehabilitation that the court declined to consider. And, upon our independent review of the record, we have found none.

There is no dispute that the respondent parents introduced some postpetition evidence, including, among other things, a competence based parenting assessment of the respondent mother completed by Kathleen M. Brown, dated April 30, 2020, and a psychotherapy intake note regarding the respondent mother, which was completed by Nicole M. Hayes, a licensed professional counselor. The court considered this evidence in the context of the dispositional phase of the termination proceedings. This postpetition evidence, however, did not offer any additional perspective determinative of the issue of the respondent father's rehabilitation. Specifically, this evidence did not demonstrate that the respondent mother no longer posed a threat to the children or that the respondent father intended to parent the children without her.[20]

The respondent father also argues that the evidence is insufficient to support the court's conclusion that he had failed to rehabilitate because the record demonstrates that he is willing and capable of benefiting from continued efforts toward reunification and that he could assume a responsible position in Richard's life, within a reasonable time, with proper support services in place. There is no indication in the record, however, that the respondent father sought the department's help in obtaining additional support services. Nor is there any

evidence that the respondent father intended to rely on support services if reunification were to be granted, even though the respondent father was apprised of the department's concerns with respect to, inter alia, the respondents' intention to have the respondent mother care for the children while the respondent father was at work. See *In re Gabriel C.*, supra, 196 Conn. App. 358 ("[t]he purpose of the social study is to put parents on notice of allegations that need to be explained or denied" (internal quotation marks omitted)). To the extent the respondent father is maintaining that he should have been afforded more time to rehabilitate, "we recently have noted that such an argument is inconsistent with our Supreme Court's repeated recognition of the importance of permanency in children's lives." (Internal quotation marks omitted.) *In re Phoenix A.*, supra, 202 Conn. App. 847 n.4.

Construing the evidence in the manner most favorable to sustaining the court's judgment, as we must, we conclude that the evidence was sufficient to support the court's conclusion that the respondent father had failed to rehabilitate. Because the court determined that the respondent mother had failed to achieve a sufficient degree of rehabilitation and continued to pose a risk to Richard, it was entitled to rely on those findings and the respondent father's continued involvement with the respondent mother to conclude that the respondent father also had failed to rehabilitate. As our Supreme Court has observed, in considering whether a parent has failed to rehabilitate, trial courts have relied on evidence that a parent has continued to associate with a party who poses a danger to a child. See *In re Jorden R.*, supra, 293 Conn. 562 n.20; see also *In re Corey C.*, 198 Conn. App. 41, 76, 232 A.3d 1237 (court's determination that father failed to rehabilitate was not improper even though court's conclusion relied, in part, on factual findings related to risk mother posed to child), cert. denied, 335 Conn. 930, 236 A.3d 217 (2020); *In re Albert M.*, 124 Conn. App. 561, 565, 6 A.3d 815 (trial court's finding that father failed to rehabilitate was not clearly erroneous because record supported finding that father had "knowledge of the necessity of changing his relationship with the mother," yet failed to appreciate risk mother posed to child), cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010); *In re Ellis V.*, 120 Conn. App. 523, 531–32, 992 A.2d 362 (2010) (record supported trial court's finding that father failed to achieve sufficient rehabilitation because he remained loyal to child's mother and entrusted child to mother's care while he was away for work, despite knowledge of mother's psychological and substance abuse issues).

In the present case, the respondent father was given an opportunity to pursue reunification on his own, but he declined to do so. Regardless of the respondent father's progress toward addressing the factors that led to Richard's commitment, given his failure to appreciate

the risk posed by the respondent mother and his commitment to parent with her as a unit, we cannot find fault with the trial court's determination that he had failed to achieve the requisite personal rehabilitation so as to encourage the belief that, within a reasonable time, he could assume a responsible position in Richard's life.

C

Last, the respondent father claims the court improperly found that termination of his parental rights was in Richard's best interest. He contends that the trial court too narrowly focused on the respondents' actions prior to the filing of the termination petitions and failed to accord appropriate weight to evidence demonstrating that he consistently attended visitation and engaged in services, in addition to progress made by the respondent mother after the adjudicatory date. We do not agree that the court's best interest determination was clearly erroneous.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the [child] only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interest in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the [respondent father's] parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding the seven statutory factors delineated in [§ 17a-112 (k)].[21] . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Footnote added; internal quotation marks omitted.) *In re Brian P.*, supra, 195 Conn. App. 579.

"[T]he fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing of evidence . . . by the legislature. [If] . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . . Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence

is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference." (Internal quotation marks omitted.) *In re Jacob M.*, 204 Conn. App. 763, 789, 255 A.3d 918, cert. denied, 337 Conn. 909, 253 A.3d 43 (2021), and cert. denied sub nom. *In re Natasha T.*, 337 Conn. 909, 253 A.3d 44 (2021).

In the dispositional phase of the termination proceedings, the court made the following relevant findings. With respect to the criteria set forth in § 17a-112, the court found that (1) the department had timely made referrals to address the most important concerns that had been identified by the petitioner and service providers who had worked with the respondents to facilitate reunification; (2) the department had made reasonable efforts to reunify the respondents and the children, including providing substantial supervised visitation and multiple referrals for services; (3) the respondent father had made determined and significant progress toward improving his marital relationship and complied with nearly every specific step but, nonetheless, remained unable to appropriately assess the threat to the children's safety and well-being insofar as the respondent mother is concerned; (4) Richard had bonded to his foster family and seeks their comfort and support; (5) Richard was twenty-seven months old and had been with his foster family since his discharge from the hospital after his birth; (6) the respondent father had failed to appreciate that the respondent mother poses a substantial risk to the children; and (7) there was no unreasonable conduct or economic circumstances that prevented the respondents from maintaining a meaningful relationship with the children.

In addition to the foregoing findings, the court found that the "respondent mother's resistance to meaningfully address the impact of her past trauma on her parenting history and her continuation of the cycle of parent-child violence causes serious concern for the children's welfare." Notwithstanding that the respondents had made demonstrable strides to address their intimate partner violence and communication issues, which the court applauded, the court found that those efforts had failed to address the primary areas of concern that were noted by the petitioner at the outset of this case when seeking custody of Lillyanne. On the basis of all of the evidence presented, the court ultimately found that there was no basis in the record to conclude that the respondent parents would be willing to adjust their circumstances such that the court could form a belief that they could safely and appropriately parent the children in the foreseeable future. Accordingly, the court concluded that terminating the respondents' parental rights was in Richard's best interest.

Importantly, the respondent father does not challenge the accuracy of any of the facts underlying the

court's findings with respect to the criteria enumerated in § 17a-112 (k). Instead, in his appellate brief, he appears to ask this court to reweigh the evidence that was presented to the trial court so that we might reach a conclusion that differs from the one reached by the trial court. That is not our role or function. See, e.g., *In re Janazia S.*, 112 Conn. App. 69, 99, 961 A.2d 1036 (2009) ("Our function as an appellate court is to review and not retry the proceedings of the trial court. . . . The probative force of conflicting evidence is for the trier to determine." (Internal quotation marks omitted.)). "[A] trial court's factual findings are accorded great deference" and will not be disturbed unless those findings are clearly erroneous. See, e.g., *In re Davonta V.*, 285 Conn. 483, 488, 940 A.2d 733 (2008).

Although the court discussed at length the evidence concerning the respondent mother's failure to address the root causes underlying her history of threatening or attempting to harm her children and the respondent father's inability to recognize the threat she posed to Richard's safety and well-being, it was not improper for the court to consider evidence relevant to its adjudicatory findings. As this court previously has observed, even though "the emphasis shifts from the parent to the child in the dispositional phase . . . a trial court is not required to blind itself to any parental deficiencies that also were considered during the adjudicatory phase. Our precedents establish that the consideration of the parent's circumstances, including the parent's degree of rehabilitation, is proper during the dispositional phase." (Citation omitted.) *In re Malachi E.*, 188 Conn. App. 426, 437, 204 A.3d 810 (2019). Additionally, the trial court's memorandum of decision makes clear that it did weigh the evidence that was more favorable to the respondent father in considering whether termination of his parental rights was in Richard's best interest. Nevertheless, the court noted that Richard had been in the care of his foster parents for more than two years at the time of the termination trial and could not afford to wait for the respondents to make the necessary adjustments to ensure his safety and well-being. Aside from the time he spent in the hospital following his birth, Richard has spent his entire life residing in the home of his foster parents, where two of his biological siblings also were placed. See footnote 9 of this opinion. The record indicates that he is flourishing in his placement and shares a strong bond with his foster parents, who have expressed a commitment to adopt him. He requires permanency, stability, and a safe environment to continue to thrive. In light of the court's factual findings concerning the respondent mother's unwillingness to rehabilitate in a substantive manner, the respondent father's inability to perceive the risk she poses to the children, and the likelihood that the respondents will not substantially adjust their circumstances within the foreseeable future so as to ameliorate these con-

cerns, we conclude that the court's determination that it was in Richard's best interest to terminate the respondent father's parental rights is not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

\*\* September 1, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In both appeals, the attorney for Richard filed a statement pursuant to Practice Book §§ 67-13 and 79a-6 (c) adopting the brief of the petitioner.

[2] The respondents also appealed from the trial court's judgment terminating their parental rights as to their minor child, Lillyanne D. Prior to oral argument before this court, the respondents withdrew their claims on appeal with respect to Lillyanne. Throughout this opinion, we refer to Lillyanne and Richard individually by name and collectively as the children.

[3] The record reflects that the respondent mother made a comment during an argument that the respondent father had understood to be a veiled threat against Lillyanne. The respondent mother had stated, in essence, that the respondent father did not want to get a call someday that something had happened to Lillyanne.

[4] The respondent father reported to the department that the respondent mother essentially had stated that, if he went to work, she was going to call him and tell him news that he was not going to like about Lillyanne. The respondent father understood the respondent mother's statement to imply that she was threatening to harm Lillyanne.

[5] The respondent mother was charged with disorderly conduct, interfering with a 911 call, and risk of injury to a child. On October 2, 2017, she pleaded guilty to interfering with a 911 call and was sentenced to one year of incarceration, execution suspended, and one year of probation.

[6] The department substantiated the allegations of emotional neglect and physical abuse against the respondent mother, and a maternal relative of the respondent mother obtained temporary guardianship over Margaret. Margaret was returned to the respondent mother's care in 1998.

[7] The department filed neglect petitions following this incident based on substantiated physical and emotional neglect, but the petitions were withdrawn due to evidentiary insufficiency.

[8] Although, due to the department's investigation protocol, Michael did not know about the nature of the allegations concerning Lillyanne, he stated to a department social worker: "[L]et me guess, she either tried to harm [Lillyanne] or threatened to harm [Lillyanne] because that is what she did with me over [one of our children] when we were together." (Internal quotation marks omitted.)

[9] During the pendency of the underlying proceedings, the respondents had two more children, Daniel D. and James D. Both children were removed from the respondents' care on the basis of predictive neglect.

[10] On January 5, 2022, the petitioner filed a motion for articulation, seeking clarification as to whether the trial court also had determined that the challenged documents were admissible pursuant to the business records exception to the rule against hearsay. See Conn. Code Evid. § 8-4. The trial court denied the motion for articulation. On January 21, 2022, the petitioner filed with this court a motion for review of the trial court's denial of her motion for articulation. This court granted the petitioner's motion for review but denied the relief requested therein.

On February 3, 2022, the petitioner filed a preliminary statement pursuant to Practice Book § 63-4 (a) (1), asserting as an alternative ground for affirming the trial court's judgment as to the respondent mother that the documents were admissible under the business records exception. The respondent mother claims on appeal that the challenged documents do not

satisfy the requirements of § 8-4 of the Connecticut Code of Evidence. Our conclusion that any error in admitting the documents under the residual exception to the hearsay rule was harmless makes it unnecessary to address this claim.

[11] We note that, because Richard was adjudicated neglected on the basis of predictive neglect, the factual record concerning Lillyanne is necessarily relevant to the court's termination of the respondents' parental rights as to Richard.

[12] The department contracts with and provides referrals to USI, which provides reunification and other support services for families involved with the department.

[13] In his appellate brief, the respondent father frames his first claim as follows: "The trial court erred in its findings that the respondent father was unable or unwilling to benefit from reunification services for his children." On the basis of certain arguments presented in his brief and at oral argument before this court, however, we interpret the respondent father's claim to be challenging both the court's finding that the department made reasonable efforts toward reunification and its finding that he was unable or unwilling to benefit from such efforts. Because we conclude that there was sufficient evidence in the record to support the court's finding that he was unable to benefit from reunification services, we need not address whether the court properly found that the department made reasonable efforts to reunite him with Richard. See *In re Gabriella A.*, 319 Conn. 775, 777 n.4, 127 A.3d 948 (2015).

[14] See footnote 11 of this opinion.

[15] As previously noted, the social study was admitted into evidence as a full exhibit without objection. See part I of this opinion. Although the petitioner must submit a social study to the court for purposes of the dispositional hearing in contested cases; see General Statutes § 45a-717 (e) (1); Practice Book § 35a-9; the court may rely on the social study in both the adjudicatory and dispositional phases of a termination of parental rights proceeding. See *In re Anna Lee M.*, 104 Conn. App. 121, 128, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007).

[16] The record does not indicate what alternative caregiving plan the respondent father had proposed.

[17] The department also may meet its burden concerning reunification efforts under § 17a-112 (j) (1) based on "a previous judicial determination that such efforts were not appropriate." (Internal quotation marks omitted.) *In re Ryder M.*, supra, 211 Conn. App. 808.

[18] After Richard was born in June, 2019, the court ordered specific steps that encompassed the same steps that previously had been ordered with respect to facilitating the respondents' reunification with Lillyanne.

[19] At trial, Andrews testified that this information was gleaned from her review of the department's records and that she did not recall personally having discussed the respondents' childcare plans with them.

[20] For example, the parenting assessment focused on ways in which to eliminate barriers impacting the respondent mother's ability to function, but it did not undertake to diagnose her mental health issues or to contradict Mantell's report. With respect to Hayes' psychotherapy intake note and assessment, it consisted of only a sixty minute session with the respondent mother, which included a thirty minute interview that focused on whether she needed trauma therapy. Other than an interview with the respondent mother and the administration of two testing instruments, which took place three days prior to the start of trial, Hayes' assessment did not take into consideration other sources of information, such as Mantell's report, which concluded that the respondent mother needed further focused treatment to address her violent threats to her children. Hayes clarified her assessment, testifying that she was not recommending that the children be returned to the respondent mother's care.

[21] General Statutes § 17a-112 (k) provides in relevant part: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect

to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child . . . ."

———————————————————