# IN RE ELLIS V. ET AL.*
## (AC 29992)

Robinson, Alvord and Mihalakos, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued November 12, 2009—officially released April 20, 2010

*John J. McGrath, Jr.*, for the appellants (respondent mother and respondent father Darin O.).

*Kirsten S. P. Rigney*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan Quinn Cobb*, assistant attorney general, for the appellee (petitioner).

*Karen Oliver Damboise*, for the minor child Ellis V.

*Raymond F. Parlato*, filed a brief for the minor child Zandelee V. et al.

*Opinion*

MIHALAKOS, J. The respondent mother of four minor children and the respondent father[1] of one of those

---

[1] The court also terminated the parental rights of the biological fathers of Ellis, Zandelee and Julian, three of the four minor children involved in this appeal. Those three fathers have not been involved with any of the trial proceedings and have not appealed from the judgments terminating their parental rights. The respondent father of the fourth child, Abigail, has been adjudicated to be the father of that child. We therefore refer only to the mother of the four children and the father of Abigail as the respondents.

children appeal from the judgments of the trial court terminating their parental rights with respect to the children for failure to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B). We affirm the judgments of the trial court.

The following facts and procedural history are relevant to our review of the respondents' claims. The respondent mother is the biological mother of the four children involved in this appeal: Ellis, Zandelee, Julian and Abigail. The respondent father is the father of only Abigail.[2] The other three children have three different fathers, who each reside in South Africa and have failed to participate in any of these proceedings. The four children were born in South Africa and now reside in Connecticut. The respondent mother met the respondent father in 1999, and they were married in October, 2000. In 2000, the respondent mother gave birth to Abigail, and the respondents moved to Connecticut with all four children in 2001.

The respondent mother was born in South Africa in 1974, is seriously underweight, appearing to weigh no more than seventy pounds, and admits to regular use of crack cocaine. She remained in orphanages throughout her youth, has eight years of education, and her only known employment was providing day care and working as a waitress in South Africa.

The respondent father was born in 1969 and has a bachelor of science degree in marine engineering. He has been steadily employed for his entire adult life, and his current job as a chief engineer requires that he travel out of the country for at least three months at a time. While his job pays him over $100,000 per year, he is away at sea for at least one half of every year. He has

---

[2] The respondent mother has told the department that the respondent father is not the biological father of Abigail.

been doing this work for more than fifteen years and, at the time of trial, needed approximately four more years of actual sea duty to qualify for a union pension.

In 2005, the department of children and families (department) received five referrals regarding domestic violence between the respondents, which led the department to refer the family for domestic violence counseling. In March, 2006, school authorities expressed concern that Abigail, a child with profound medical and special education needs, had missed fifty-one days of school and consistently showed up at school with head lice. Abigail has significant medical problems that require constant attention. She suffers from Brown's syndrome, which causes her to see double and lose her balance in an effort to see. She also suffers from microcephaly, a condition manifested by smaller than usual head size and an abnormally small brain. She was delayed in her speech development, fine motor skills and toilet training. The department determined that Abigail was physically, medically and educationally neglected by the respondent mother.

At the time of the 2006 investigation by the department, the respondent father was at sea. The department entered into a service agreement with the respondent mother, requiring that she submit to a mental health evaluation, cooperate with a parent aide provided by the department and ensure adult supervision of the children twenty-four hours a day. Subsequent investigations confirmed that the respondent mother failed to comply; the house was in a "horrible" state of disorder and uncleanliness. The department also confirmed that the mother was abusing drugs, and missed three scheduled mental health evaluations and two appointments for substance abuse evaluation, which included hair and urine screening.

On May 22, 2006, the petitioner, the commissioner of children and families, sought and obtained an order of

temporary custody of the children. They were removed from the home and have not been returned. On June 21, 2006, the respondents contested the initial order of temporary custody. The court, *Foley, J.*, found that the children were in immediate danger and that the respondent father's denial of his wife's substance abuse issues was a serious problem. The court advised the respondent mother that she needed treatment, and advised the respondent father that his return to sea would leave his daughter at risk in the respondent mother's care and jeopardize reunification with his daughter.

In September, 2007, the petitioner filed petitions for termination of parental rights as to both respondents. The court heard seventeen witnesses and admitted twenty-six exhibits during a three day trial that concluded on May 8, 2008. On May 20, 2008, the court granted the petitions and terminated the parental rights of both respondents. This appeal followed. Additional facts will be set forth as necessary.

We must first set forth the applicable standard of review. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Zion R.*, 116 Conn. App. 723, 732–33, 977 A.2d 247 (2009).

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing

will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported." (Internal quotation marks omitted.) *In re Cheila R.*, 112 Conn. App. 582, 589, 963 A.2d 1014 (2009). "In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 148, 962 A.2d 81 (2009).

"A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In applying the clearly erroneous standard to the findings of a trial court, we keep constantly in mind that our function is not to decide factual issues de novo. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *In re Janazia S.*, 112 Conn. App. 69, 81, 961 A.2d 1036 (2009). We now turn to the respondents' claims.

I

The respondents claim that the court improperly concluded that they failed to achieve a sufficient degree of personal rehabilitation. The respondents argue that they were not given enough time to sufficiently rehabilitate and that the court disregarded evidence of the

respondent father's positive effect on the family. Because the record supports the court's finding, there is no error.

Section 17a-112 (j) (3) (B) "requires the court to determine whether the degree of personal rehabilitation . . . encourage[s] the belief that within a reasonable time . . . such parent could assume a responsible position in the life of the child . . . . Personal rehabilitation refers to the reasonable foreseeability of the restoration of a parent to his or her former constructive and useful role as a parent, not merely the ability to manage his or her own life." (Internal quotation marks omitted.) *In re Stanley D.*, 61 Conn. App. 224, 230, 763 A.2d 83 (2000). "In conducting this inquiry, the trial court must analyze the respondent's rehabilitative status as it relates to the needs of the particular child . . . . The trial court must also determine whether the prospects for rehabilitation can be realized within a reasonable time given the age and needs of the child." (Internal quotation marks omitted.) *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999); see also *In re Melody L.*, supra, 290 Conn. 148 ("trial court's finding that a parent has failed to achieve sufficient rehabilitation will not be overturned unless it is clearly erroneous" [internal quotation marks omitted]).

"Rehabilitation does not require the parent to be able to assume full responsibility for a child without the use of available support programs. . . . An inquiry regarding personal rehabilitation requires us to obtain a historical perspective of the respondent's child-caring and parenting abilities." (Citations omitted; internal quotation marks omitted.) *In re Stanley D.*, supra, 61 Conn. App. 230–31.

In its memorandum of decision, the court outlined the specific steps required for the respondents to regain

custody of their children. The steps included the customary requirements that the respondents cooperate with the department, visit as often as permitted, attend counseling, avoid criminal activity and avoid further substance abuse. The department offered various services, including individual counseling to address parenting skills, mental health and substance abuse. The department offered services through New Perceptions for outpatient substance abuse, Saint Francis Hospital and Medical Center in Hartford for inpatient treatment, Rushford Hospital for inpatient treatment, Blue Hills treatment center for inpatient substance abuse, AdCare Hospital in Worcester, Massachusetts for inpatient substance abuse and Sachem House for follow-up outpatient substance abuse. The department also offered home health aides, but their services were refused by the respondent mother. Finally, the respondents were offered marital counseling at New Perceptions.

Although the respondent mother was warned that she needed to address her substance abuse problem, she has consistently tested positive for cocaine use throughout the past two years. According to the respondent mother, she " 'would lie, steal, hide something, [and she] would close the door of [her] bedroom and use drugs.' " Although she says that her goal is to get better and she believes that she has made significant progress, she continues to abuse drugs and has admitted that she has a " 'long way to go.' "

In the first few months after the removal of her children in the summer of 2006, the respondent mother was offered treatment at an adult outpatient treatment facility. She only attended the fifth group session, arriving twenty minutes late and abruptly leaving before the required drug screen. She also avoided an inpatient treatment program at Connecticut Valley Hospital in Middletown, a facility for persons diagnosed with both mental health and substance abuse problems. It was not

until April, 2007, that she entered an inpatient treatment program called Gosnold on Cape Cod in Falmouth, Massachusetts. Her primary diagnosis was cocaine addiction. The Gosnold program, and the department, recommended follow-up outpatient support and therapy at Sachem House, a division of Natchaug Hospital in Mansfield Center. She entered that program on June 29, 2007, and was discharged on July 19, 2007. She attended only four days of treatment and made no progress toward her treatment goals. Her discharge report stated that her prognosis was poor.

Drug tests have confirmed that the respondent mother continues to use cocaine, and she admits that she did not complete that program because "[her] body was still craving drugs." The petitioner's expert witness, a psychologist who conducted a court-ordered evaluation of the respondent mother, represented to the court that it was "unlikely that reunification and rehabilitation would be possible." In a psychological assessment report prepared by the psychologist and introduced as an exhibit at the trial, she stated that, given the length of time since the children had been removed, it was "highly doubtful" that rehabilitation of the respondent mother's "significant emotional issues" would occur within a reasonable time. Although the respondent mother seems to be using drugs less frequently, she is still regularly abusing drugs and is inconsistent in her treatment. Moreover, at trial, the testimony was unanimous that the children have various emotional and physical problems, need stability and should not be returned to the respondent mother. Accordingly, the court correctly found that, given the needs of the children, the respondent mother could not achieve a sufficient degree of rehabilitation within a reasonable time.

The record also supports the court's finding that the respondent father has failed to achieve a sufficient

degree of rehabilitation. He remains loyal to the respondent mother, and nothing changed in the two years following the children's removal from the home. The respondent father's job required that he be away at sea at least six months each year. Irrespective of Abigail's considerable medical problems, the respondent father entrusted her care to the respondent mother with the knowledge that the respondent mother has significant psychological and substance abuse problems and could not care for Abigail properly. While he was gone at sea, he took no action to protect Abigail from this precarious state of affairs.

After the children were taken into custody by the petitioner, the respondent father was informed by the court and the department that he would lose his parental rights with respect to Abigail if he continued to deny his wife's problems. He was informed that in order to be reunited with Abigail, he would need either to leave his wife or to change his job so that he could remain stateside. In fact, the respondent father had an opportunity to take a job stateside and address these family issues, but he chose not to do so because of its potential financial impact.[3] While we recognize that taking a job stateside would have financial implications for the respondent father, his decision-making behavior is not that of a father prioritizing reunification with his daughter. He stated at trial that securing a stateside job was "[j]ust a matter of a phone call to [his] employer [to] say [he] will take the job," yet, given the status quo of the two years since the children were removed from the home and the financial implications of such a move, it is not unreasonable to conclude that such a telephone call was unlikely to occur.

---

[3] Provided he remains on sea duty, the respondent father would be able to draw on his pension in approximately two years. If he were to take a job without a sea duty component, he would not be able to draw on his pension until the age of sixty-five or until he completed the requisite sea duty requirements for early retirement.

As the court stated, "[i]t is difficult to understand [the respondent father's] loyalty to [his wife]. It is her second marriage. She has four children by four men; if she is to be believed, none of her children are [the respondent father's]. In 2005, [the department's] first involvement with this family involved a domestic violence dispute in which [the respondent father] accused his wife of infidelity while he was at sea. A subsequent altercation led to his arrest on domestic violence charges. She had a pregnancy that same year, which she refuses to discuss, which, at least temporally, may be related to the domestic violence dispute. She becomes hopelessly addicted to cocaine. Her house becomes filthy, unkept, completely uninviting. . . . Her weight plummets to a near starvation appearance. She lies to him, squanders his earnings on drugs, has male overnight guests in the home during his absence and has [him] arrested on a claim of sexual assault. He also knows that if he separated from [his wife] and her drugs, he would likely regain custody of at least Abigail, and conceivably all of the children. They all view him with trust and affection. It is, therefore, difficult to explain what appears to be a completely unearned loyalty to this woman, or, as the psychologist tentatively suggested, an unhealthy co-dependence."

Between 2006 and 2008, the respondent father took four rotations at sea, clearly demonstrating his choice to prioritize his job over a desire for reunification with Abigail. Accordingly, the court correctly found that he failed to achieve a sufficient degree of rehabilitation within a reasonable time.

II

The respondents also claim that during the dispositional phase of the trial, the court improperly found that the termination of their parental rights was in the best interests of the children. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]." (Internal quotation marks omitted.) *In re Joseph L.*, 105 Conn. App. 515, 529, 939 A.2d 16, cert. denied, 287 Conn. 902, 947 A.2d 341, 342 (2008). "[Once] the court finds that the petitioner has proven by clear and convincing evidence that one of the statutory grounds for termination of parental rights exists, it must then determine whether termination is in the best interests of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 794, 952 A.2d 1280 (2008).

Pursuant to § 17a-112 (k), the statutory factors used to determine whether termination is in the child's best interest include: "(1) The timeliness, nature and extent of services offered . . . (2) whether the [d]epartment . . . has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into . . . and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents . . . and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has

been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child . . . or by the economic circumstances of the parent." General Statutes § 17a-112 (k).

We conclude that the court, in granting the petitions to terminate the respondents' parental rights, properly made its findings in consideration of the factors delineated in § 17a-112 (k). The court carefully considered each factor and found that terminating parental rights was in the children's best interests. The testimony of the evaluating psychologist, children's therapists and various social workers confirmed that the children's needs will not be met if the respondent mother resumes caring for them. The court found that the respondents have failed to comply with the specific steps provided by the court for reunification. The respondent mother continues to use illegal substances, and she is unable to provide the children with a stable and safe environment. "Because of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." (Internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 767, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008).

The children all have significant problems that must be addressed. As the psychologist who evaluated Ellis stated, "[i]t is critical to [the children's] overall psychological [and] emotional development that they have stability, predictability and permanency in their lives to move forward. [The respondent mother] is unable to provide this stability, predictability and permanency." Although the respondent father is capable of caring for Abigail, his loyalty to his wife and his sea duty schedule has prevented him from providing Abigail with a stable environment and the intensive attention and care that she requires. Accordingly, we conclude that it was not

clearly erroneous for the court to have found that it was in the best interests of the children to terminate the parental rights of the respondents.[4]

## III

The respondents' next claim that the court improperly admitted into evidence social studies prepared by the department pursuant to the business record exception to the rule against hearsay. We disagree.

The standard of review applicable to evidentiary challenges is well established and highly deferential. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 532, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

The business record exception "is derived from the recognition that the trustworthiness of such documents comes from their being used for business purposes and not for litigation." *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 369, 375, 739 A.2d 301, cert.

---

[4] The respondent father also claims that the court should have, *sua sponte*, transferred the children to his care. He never sought this relief from the court, nor does he provide legal analysis in his brief to support his claim. He has failed to request review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or under the plain error doctrine. See Practice Book § 60-5. Therefore, we decline to review this claim.

The respondent father also claims that the court's approval of the department's permanency plans, calling for termination of parental rights, was erroneous because the court should have structured a solution that would have permitted him to care for the children. For the reasons addressed in this part of our opinion and in part I of this opinion, the respondent father's claim must fail.

denied, 251 Conn. 927, 742 A.2d 362 (1999). Business records are excepted from the hearsay rule when three conditions are met: (1) the records are made in the regular course of business, (2) it is the regular course of the business to make such records and (3) the records were made at the time of the incident described in the record or shortly thereafter. *State* v. *George J.*, 280 Conn. 551, 593, 910 A.2d 931 (2006), cert. denied, 549 U.S. 1326, 127 S. Ct. 1919, 167 L. Ed. 2d 573 (2007).

Counsel for the petitioner satisfied the requirements for the court to admit the social studies as exhibits under the business record exception. The court is given broad discretion in ruling on the admissibility of evidence. See *State* v. *Grant*, supra, 286 Conn. 532. In addition, the respondents have failed to allege that the admission of this evidence was harmful and likely affected the trial result. We therefore conclude that the respondents' arguments must fail.[5]

The judgments are affirmed.

In this opinion the other judges concurred.

---

[5] The respondents also claim that the court improperly admitted hair toxicology results into evidence to substantiate the petitioner's claim of drug use by the respondents without a foundation in expert testimony. The hair toxicology results were admitted without objection, and the respondents never requested a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Because the respondents' claim was not preserved at trial, we therefore decline to afford it review.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for