******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# IN RE S. F. ET AL.*
## (AC 47517)

Alvord, Cradle and Harper, Js.

*Syllabus*

The respondent father appealed from the judgments of the trial court terminating his parental rights with respect to his minor children. The father claimed that he was denied due process because his trial counsel had rendered ineffective assistance by failing to object to the admission into evidence of hearsay contained in testimony and exhibits submitted by the petitioner, the Commissioner of Children and Families. *Held*:

The father did not demonstrate that his counsel rendered ineffective assistance, as there were one or more possible strategic reasons that were objectively reasonable for not objecting to the exhibits and testimony.

The father did not show that his counsel's vigorous cross-examination of a social worker for the Department of Children and Families in lieu of objecting to hearsay in the department's social study was not objectively reasonable.

Argued September 10—officially released October 30, 2024**

*Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of New Haven, Juvenile Matters, and tried to the court, *Conway, J.*; judgments terminating the respondents' parental rights, from which the respondent father appealed to this court. *Affirmed*.

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent father).

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** October 30, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Nisa Khan*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Monica O'Connell*, assistant attorney general, for the appellee (petitioner).

*Opinion*

ALVORD, J. The respondent father, Perry F., appeals from the judgments of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his children, A, B, and C.[1] On appeal, the respondent claims that he was denied his due process right to the effective assistance of counsel.[2] We affirm the judgments of the trial court.

A was born in December, 2016, B was born in September, 2018, and C was born in April, 2020. The family's involvement with the Department of Children and Families (department) dates back at least to April, 2017, when A was adjudicated neglected and committed to the petitioner's custody. In December, 2018, B was adjudicated neglected and committed to the petitioner's custody. In October, 2019, the court revoked the commitment as to both A and B, and the children were reunified with the respondent under a six month order of protective supervision, "with an explicit mandate that [the children's mother, Bernisha] not have unsupervised contact with the children, nor was she to reside with the children. Unbeknownst to [the department],

---

[1] The court also terminated the parental rights of the children's mother, Bernisha R. Because she has not appealed from those judgments, we refer to Perry F. as the respondent and to Bernisha by name throughout this opinion. Unless necessary to our analysis of the claims raised by the respondent, in this opinion we need not and do not address the court's findings and conclusions with respect to Bernisha.

[2] The attorney for the minor children has filed a statement adopting the appellate brief of the petitioner.

throughout the period of the court-ordered protective supervision continuing through the time when [the department] administratively closed its case in September, 2020,[3] and beyond, [Bernisha] covertly resided with the respondent . . . and [the] children, and [the respondent] left the children in [Bernisha's] unsupervised care." (Footnote in original.)

"In the early morning hours of December 12, 2020, [the department] . . . assumed temporary custody of [A, B, and C] after police found the three children alone in a Days Inn hotel room, a room [the respondent] checked into with the three children just hours before [Bernisha] was shot in the leg as she was returning to her separate Days Inn room after having purchased cigarettes at a nearby gas station."

On December 15, 2020, the petitioner obtained ex parte orders of temporary custody. The following day, on December 16, 2020, the petitioner filed neglect petitions as to the children.

"The alleged shooter [of Bernisha], Jaymar Kelly, an acquaintance of [the respondent], was arrested and incarcerated in January, 2021. In April, 2021, [the respondent] was arrested on various charges, including conspiracy [to commit] assault, risk of injury [to a child], and threatening . . . stemming from the December 11 shooting and its aftermath. From April to August, 2021, [the respondent] was held on bond by the Department of Correction . . . . In October, 2022, [the respondent] pleaded [guilty] to possession of narcotics with the intent to sell (in November, 2020, [the respondent] had been arrested for possession of one

[3] "The court-ordered protective supervision period ran from October, 2019, to April, 2020. Given that [C was] discharged to [the respondent's] care in April, 2020, [the department] administratively, but without court involvement, remained involved with the family until September, 2020."

hundred packets of cocaine/fentanyl) and to threatening [Bernisha]. The alleged conspiracy [to commit] assault and risk of injury charges were not pursued due, at least in part, to [Bernisha's] refusal to testify and/or her recantation of [the respondent's] involvement in the planning and carrying out of the shooting." (Footnote omitted.)

On March 11, 2021, the respondent entered pleas of nolo contendere as to all three children's neglect petitions, and the children were adjudicated neglected and committed to the petitioner's custody. On March 28, 2022, the petitioner filed petitions to terminate the respondent's parental rights with respect to the children on the grounds that the children previously had been adjudicated neglected and that the respondent had failed to achieve a sufficient degree of rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B).

A trial on the petitions for the termination of parental rights was held over the course of several days in November, 2023, and January, 2024, before the court, *Conway, J.* The petitioner presented the testimony of two witnesses, department social worker Julie Dixon and Dr. Jessica Biren Caverly, an expert in clinical and forensic psychology who performed a psychological evaluation with respect to the respondent. The respondent testified and presented the testimony of David Melchionne, an employee of 'r Kids Family Center. Melchionne supervised visitation between the respondent and the children.[4]

On February 2, 2024, the court issued a memorandum of decision in which it terminated the respondent's parental rights. The court found by clear and convincing evidence that the department had made reasonable

---

[4] Bernisha also testified and presented the testimony of Lisa Milone, who was assigned to work with Bernisha through Milone's role as a multidimensional family recovery specialist with Communicare.

efforts to reunify the minor children with the respondent and that the respondent was unable or unwilling to benefit from reunification efforts.

The court also found that the respondent had failed to achieve an appropriate degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the ages and needs of the minor children, he could assume a responsible position in their lives. Specifically, the court found that intimate partner violence (IPV) has permeated the respondent's relationship with Bernisha, dating back to approximately 2017. The court found that the respondent "remains woefully ignorant as to how his controlling and threatening interactions toward [Bernisha] not only define their relationship but is a textbook example of controlling, coercive IPV behavior. . . . [The respondent's] deep denial about his pathological behaviors toward [Bernisha], and his persistent refusal/unwillingness to substantively engage in and successfully benefit from mental health and IPV treatment (to meaningfully alter his intolerably unbalanced and dangerous relationship with [Bernisha]), forecloses him from being a safe and competent caregiver to [A, B, and C]."[5] (Citation omitted; footnote omitted.) In addition to the IPV behavior, the court noted the respondent's "entrenched, loud

[5] In a footnote, the court explained: "Undoubtedly, the December 11th shooting factored heavily into [the department's] decision to remove the children from [the respondent's] care in the early morning hours of December 12th and presumably in the parties' agreement to sustain the [order of temporary custody] and in the eventual March, 2021 agreement (wherein the [respondent and Bernisha] entered nolo contendere pleas and the children were adjudicated neglected and committed to the petitioner's care). Aside from permitting the children to be left alone in the hotel room, whatever role, if any, [the respondent] played in the planning and execution of the December 11th shooting is not relevant to this termination trial." Subsequently, the court again noted that, although any role the respondent may have played in the shooting was not relevant to the termination trial, "the fact that the children were found by authorities alone in the hotel room is. [The respondent's] contention that the children were not found alone in the hotel room, postshooting, is not credible."

and authoritative parenting style," and found that the respondent was not capable of providing "the nuanced parenting style" that A and B require because of their trauma. The court also found that "credible testimony and evidence reveal that, if given the opportunity, the respondent . . . would, as he has done in the past, relegate some or much of the daily parenting responsibilities to [Bernisha], and he would not comply with court orders barring [Bernisha's] unsupervised access to the three children."

In the dispositional phase of the proceedings, the court made findings as to each of the criteria set forth in § 17a-112 (k) and concluded that the termination of the respondent's parental rights was in the minor children's best interests. Accordingly, the court rendered judgments terminating the respondent's parental rights and appointing the petitioner as the minor children's statutory parent. This appeal followed.

On April 23, 2024, the respondent filed a motion for articulation, asking the trial court to articulate the factual basis for its determination that the respondent had left his three children alone and unsupervised in a hotel room. On April 24, 2024, the trial court granted the motion for articulation and issued a memorandum of decision, which stated: "This court's factual finding that the children were found alone in the Days Inn room on the night of December 11, 2020, arises, at least in part, from the November 22, 2023 credible trial testimony of [department] social worker Julie Dixon, specifically her testimony during the respondent father's cross-examination . . . . The court also credited what was stated in exhibit C, pp. 7–8: 'On December 11, 2020, Social Work Investigator Shaun Williams spoke with . . . [New Haven Police Department] Officer Rivellini about the incident at the Days Inn Motel. The officer reported that [the respondent] had fled the scene, leaving behind [A, B, and C] in a hotel room he had rented that same

day.' [The respondent's] assertion [that] the children were found in a car with his grown son, Perry Jr., (exhibit I, p. 20) is not credible." (Footnote omitted.) The court stated in a footnote that exhibits C and I were admitted as full exhibits without objection.

On appeal, the respondent claims that he was denied his due process right to the effective assistance of counsel during the termination of parental rights proceeding. Specifically, he contends that his trial counsel rendered ineffective assistance in failing to object to hearsay evidence contained in testimony and exhibits submitted by the petitioner. We are not persuaded.

The following additional procedural history is relevant to this claim. At the commencement of the trial, the petitioner identified her proposed exhibits, including but not limited to the department's social study,[6] which was identified as exhibit C, and its addenda, identified as exhibits D, E, and F (addenda). The respondent's counsel did not object to the introduction into evidence of exhibit C or its addenda, and the documents were admitted as full exhibits.

As the court stated in its articulation, exhibit C includes the following: "On December 11, 2020, Social Work Investigator Shaun Williams spoke with . . . Officer Rivellini about the incident at the Days Inn Motel. The officer reported that [the respondent] had fled the scene, leaving behind [A, B, and C] in a hotel room he had rented that same day." (Internal quotation marks omitted.)

The respondent identifies other statements in exhibit C that he contends constitute hearsay, including: "[The

[6] "A social study is a document prepared by the department that compiles relevant information regarding the respondent's history with the department, including notes from caseworkers, medical professionals, visit supervisors, and other relevant parties." *In re A. H.*, 226 Conn. App. 1, 7 n.4, 317 A.3d 197, cert. denied, 349 Conn. 918, 317 A.3d 784 (2024).

respondent] was guarded and provided conflicting information with his answers compared to [a] previous intake [at Grant Street Partnership] in January, 2021. He also refused to complete the trauma assessment or discuss any legal involvement." The respondent also identifies the following: "Currently, [the respondent] is participating in Fathers for Change, at Yale Child Study Center. A referral was made by [the department] for this program on September 30, 2021. At [the respondent's] intake on October 26, 2021, he informed Dr. Carla Stover, lead investigator of the Yale study, that the program was too long, and he needed to finish the program within ninety days to get his children back. Social Worker Dixon clarified with Dr. Stover that this was not true. His attendance was sporadic for a period, and he never mentioned the shooting incident at intake." Finally, the respondent identifies the following: "Ms. [Brittany] Bauer [of the Family Centered Services parenting program] reported that [the respondent] believes he is a very good parent and there is little room for improvement. He seems to have had a lax parenting style and not a lot of follow-through. Ms. Bauer reported that [the respondent] seems to have left the kids to do whatever they want to."

We next set forth the principles that guide our review. "Our Supreme Court has recognized that, [i]n Connecticut, a parent who faces the termination of his or her parental rights is entitled, by statute, to the assistance of counsel. General Statutes § 45a-717 (b). . . . The Supreme Court further has held, consistent with that statutory right, that a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel. . . .

"In *State* v. *Anonymous*, 179 Conn. 155, 160, 425 A.2d 939 (1979), our Supreme Court set forth the following standard for determining whether counsel has been ineffective in a termination proceeding: The range of

competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law. . . . The [respondent] must, moreover, demonstrate that the lack of competency contributed to the termination of parental rights. . . . A showing of incompetency without a showing of resulting prejudice . . . does not amount to ineffective assistance of counsel. . . . In making such a claim, it is the responsibility of the respondent to create an adequate record pointing to the alleged ineffectiveness and any prejudice the respondent claims resulted from that ineffectiveness. . . . In the absence of findings by the trial court in this regard, we directly review the trial court record. . . .

"We are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that [the] conduct [of trial counsel] falls within the wide range of reasonable professional assistance; that is, [an appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citations omitted; internal quotation marks omitted.) *In re Wendy G.-R.,* 225 Conn. App. 194, 204–205, 314 A.3d 1029, cert. denied, 349 Conn. 916, 316 A.3d 357 (2024).

The respondent claims on appeal that his trial counsel rendered ineffective assistance in failing to object to the introduction into evidence of exhibit C and hearsay testimony from the department's worker.[7] Specifically,

[7] Exhibit I was the report of the psychological evaluation of the respondent prepared by Dr. Caverly, who was qualified as an expert witness in the field of clinical and forensic psychology. At the commencement of Dr. Caverly's

he contends that the statement in exhibit C that social work investigator Williams spoke with Officer Rivellini, who reported that the respondent had fled the scene, leaving the children in the hotel room, constituted double hearsay, because Williams is not the author of the social study, and Williams reported the hearsay statements of Officer Rivellini. The respondent further contends that "[n]obody from the department was present at the Days Inn on December 11, 2020. All testimony related to the incident was, by definition, hearsay and should have been excluded upon a proper objection."

This court recently has reaffirmed that "counsel for a respondent parent may object to the admission of

testimony, the petitioner offered into evidence the evaluation, and it was admitted without objection.

In the respondent's principal appellate brief, he makes brief reference to exhibit I, noting that "exhibit C and exhibit I (which repeats the hearsay) were not objected to by trial counsel." The only other references to exhibit I are contained within the prejudice section of the respondent's brief. In the petitioner's brief, she maintains that the respondent "does not claim that trial counsel was ineffective for failing to object to the court-ordered evaluator's report, exhibit I." In his reply brief, the respondent does not maintain that such statement is inaccurate, and he otherwise does not address exhibit I. At oral argument before this court, however, the respondent's counsel maintained that the respondent's claim of ineffective assistance of trial counsel did encompass the failure to object to exhibit I.

Because the respondent has failed to identify particular statements in exhibit I that he contends constituted inadmissible hearsay, we conclude that any claim with respect to exhibit I is inadequately briefed. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *In re A. H.*, 226 Conn. App. 1, 31 n.23, 317 A.3d 197, cert. denied, 349 Conn. 918, 317 A.3d 784 (2024); see id. (because respondent failed to brief how he was harmed by hearsay from evaluation related to mother of children, any claim in relation thereto was deemed abandoned). Consequently, any such claim of ineffective assistance with respect to the failure to object to exhibit I is deemed abandoned.

material contained within a social study on evidentiary or other grounds . . . .” *In re A. H.*, 226 Conn. App. 1, 25, 317 A.3d 197, cert. denied, 349 Conn. 918, 317 A.3d 784 (2024). One such evidentiary basis for objection is that the material constitutes inadmissible hearsay. “[O]ut-of-court statements offered to establish the truth of the matter asserted are hearsay. Such statements generally are inadmissible unless they fall within an exception to the hearsay rule.” (Internal quotation marks omitted.) *In re Tayler F.*, 296 Conn. 524, 536, 995 A.2d 611 (2010).

As noted previously, the respondent’s counsel did not object to the challenged evidence during trial, and the record does not contain evidence of counsel’s actual trial strategy underlying the decision to forgo an objection. “[W]e, as a reviewing court, are mindful of the presumption that counsel acted reasonably, and we must contemplate possible strategic reasons that might have supported counsel’s challenged actions before considering whether those actions were objectionably reasonable. This is the proper analytical path that governs claims of ineffective assistance of counsel in habeas corpus proceedings in which the record does not contain evidence of the actual trial strategy, if any, underlying trial counsel’s challenged conduct.” *In re Wendy G.-R.*, supra, 225 Conn. App. 208. In order to prevail on his claim, the respondent “must demonstrate that counsel’s failure to object cannot be explained by one or more possible strategic reasons that are objectively reasonable.” Id., 211.

We conclude that the respondent has not satisfied his burden of demonstrating that his counsel’s decision not to object cannot be explained by one or more possible strategic reasons that are objectively reasonable. In her appellate brief, the petitioner asserts that the social study would have been admissible under the business

records exception to the rule against hearsay.[8] With respect to the hearsay statements contained in the social study, specifically, social work investigator Williams' reporting of Officer Rivellini's statement, the petitioner contends that such statements are admissible because both Williams and Officer Rivellini had a duty to report the information. See *Jenzack Partners, LLC* v. *Stoneridge Associates, LLC*, 334 Conn. 374, 392, 222 A.3d 950 (2020) ("regardless of whether supporting documentation or testimony from the third party is offered—it is the third party's 'duty to report [the information] in a business context which provides the relia-

---

[8] General Statutes § 52-180 provides in relevant part: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

"The business record exception is derived from the recognition that the trustworthiness of such documents comes from their being used for business purposes and not for litigation. . . . Business records are excepted from the hearsay rule when three conditions are met: (1) the records are made in the regular course of business, (2) it is the regular course of the business to make such records and (3) the records were made at the time of the incident described in the record or shortly thereafter." (Citation omitted; internal quotation marks omitted.) *In re Ellis V.*, 120 Conn. App. 523, 536–37, 992 A.2d 362 (2010).

The respondent argues in his reply brief that a "social study is statutorily mandated to be used in litigation," and, thus, it would not have been admissible as a business record. This court previously has determined that a trial court properly admitted a social study on the ground that the petitioner had satisfied the requirements of the business record exception. See *In re Ellis V.*, supra, 120 Conn. App. 537.

bility to justify [the business records exception to the hearsay rule] . . . .' "); cf. *State* v. *Milner*, 206 Conn. 512, 520–21, 539 A.2d 80 (1988) (holding that one page police report detailing contents of telephone call was inadmissible as business record when caller was anonymous and had no duty to report). Thus, we agree with the petitioner that the respondent has not established that the evidence was inadmissible.

Second, the respondent has not shown that his counsel's pursuit of a vigorous cross-examination in lieu of objecting to any hearsay statements contained within the social study was not objectively reasonable. The respondent's counsel extensively questioned Dixon on cross-examination regarding the incident at the hotel. Specifically, he highlighted that Dixon had received the case in January, 2021, after the incident occurred. He questioned whether the respondent had left the children alone or whether he had left the children with his adult son. He further questioned Dixon: "[S]o, you have . . . no personal knowledge of whether these children were alone or not, correct?" Dixon responded: "No. I was not there. . . . No personal knowledge."[9] In conclusion on this point, the respondent's counsel asked Dixon

---

[9] Cross-examination continued between the respondent's counsel and Dixon:

"Q. . . . [W]e don't know if [the children] were there before, during [the shooting]. Correct? We don't know how long they were there.

"A. Well, there's a video of [the respondent] going down the motel hallway, putting his ear against each door. It's . . . all written on this.

"Q. Okay. But that has nothing to do with where the children were. Correct?

"A. Well, the children were with him.

"Q. But you—okay. So, the children were with [the respondent]?

"A. At the hotel. Yes.

"Q. Okay. So, the children weren't left alone by [the respondent]. Correct?

"A. No. That he later left them alone.

"Q. But you don't know if he left them alone or whether [the respondent's older son] had the kids. Correct?

"A. They were by themselves when they were removed . . . ."

whether she was "basing [her] testimony on that incident in December of 2020, where the facts are very fuzzy."

In addition to the targeted cross-examination regarding the incident at the hotel, the respondent's counsel also broadly cross-examined Dixon regarding other issues in the case. Specifically, the respondent's counsel questioned Dixon as to the respondent's compliance with certain specific steps, Grant Street Partnership's determination that the respondent did not need substance abuse treatment, and the respondent's recent engagement with Thomas Daniels with respect to a Fatherhood Engagement program.

Because there are one or more possible strategic reasons that are objectively reasonable for counsel's failure to object to exhibit C and hearsay testimony, the respondent has not demonstrated that his counsel's performance was deficient.[10] Consequently, we reject the respondent's claim that his trial counsel rendered ineffective assistance at the termination of parental rights trial.[11]

---

[10] Because we conclude that the respondent has not proven that his counsel's performance was deficient, we need not reach the respondent's argument with respect to prejudice.

[11] The respondent raises two additional claims on appeal. First, he claims that he has a due process right to a hybrid-habeas procedure within the context of a termination of parental rights trial. The respondent acknowledges that our Supreme Court, in *In re Jonathan M.*, 255 Conn. 208, 227–28, 764 A.2d 739 (2001), concluded that "due process does not dictate that the [party whose parental rights have been terminated] must be permitted to utilize the writ of habeas corpus as a procedural means of attacking collaterally the termination judgment." The court further explained that it saw "no need to utilize [its] supervisory authority to supplement the evidentiary record in direct appeals from such judgments in an effort to create an alternative to the habeas relief sought in this case." Id., 236. As the respondent acknowledges, this court is bound by our Supreme Court precedent. See *In re Wendy G.-R.*, supra, 225 Conn. App. 201 (rejecting request to reconsider appropriate options available to respondents seeking to supplement record to raise ineffective assistance of counsel claims, as *In re Jonathan M.* is binding authority). Accordingly, we reject the respondent's claim.

Finally, the respondent requests that this court exercise its supervisory

The judgments are affirmed.

In this opinion the other judges concurred.

--------

authority to create a hybrid-habeas procedure. "Supervisory authority is an extraordinary remedy that should be used sparingly . . . ." (Internal quotation marks omitted.) *In re Aisjaha N.*, 343 Conn. 709, 724, 275 A.3d 1181 (2022). "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Emphasis in original; internal quotation marks omitted.) Id.

Our Supreme Court in *In re Jonathan M.*, supra, 255 Conn. 236, declined a request to exercise its supervisory authority because "other means of vindicating the right to effective assistance of counsel exist through which an indigent parent may challenge a termination judgment." For the reasons expressed in *In re Jonathan M.*, we likewise decline the respondent's invitation to exercise our supervisory authority in this case.